## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

JONATHAN S. CALLAHAN,

Defendant.

CRIMINAL INDICTMENT

NO. 1:10-CR-353-WSD-GGB

## <u>FINAL REPORT AND RECOMMENDATION</u>

Defendant Jonathan S. Callahan ("Defendant") is charged with two counts of deprivation of rights under color of law, three counts of aiding and abetting possession with intent to distribute cocaine, three counts of extortion under color of law, and one count of possession of a stolen firearm, in violation of 18 U.S.C. §§ 242, 1951(a), 922(j) and 924(a), and 21 U.S.C. §§ 841(a) and (b), and 846. [Doc. 1]. Pending before this court is Defendant's Motion to Suppress Evidence and Statements [Doc. 19]. An evidentiary hearing on this motion was held before me on April 25, 2011. All transcript references are to the transcript of that hearing. For the reasons discussed below, I recommend that Defendant's motion [Doc. 19] be **DENIED**.

AO 72A
(Rev.8/8
2)

# I.  <u>FACTS</u>

For several months prior to his arrest on August 17, 2010, Defendant was a police officer with the Clayton County (Georgia) Police Department ("CCPD"). Fellow CCPD Officer Tony Griffin ("Officer Griffin") provided information to the CCPD's Internal Affairs division that while working as a police officer, Defendant had stolen firearms and money from motorists during traffic stops.  The CCPD gave this information to Special Agent Brian Davis ("Agent Davis") of the Federal Bureau of Investigation ("FBI"), and the FBI began to investigate these allegations.  (Tr. 53-54, 69-70, 94, 123).

Officer Griffin agreed to cooperate in the FBI's investigation.  (Tr. 70-71). At the FBI's request, he secretly recorded several conversations that he had with Defendant.  The FBI also used Officer Griffin to introduce Defendant to an undercover cooperator who posed as a drug dealer named "Rico."  (Tr. 72).  During the course of the investigation, Rico enlisted Defendant's help in protecting drug deals.  (Tr. 74-76, 98-100).

On August 13, 2010, after Defendant had participated in several undercover deals, Officer Griffin telephoned Agent Davis and told him that Defendant was getting

2

nervous, he was "freaking out" and was planning to go to the CCPD Internal Affairs investigators about his dealings with Rico.  (Tr. 76-77).

After a recorded meeting between Defendant and Officer Griffin during the weekend of August 14-15, 2010, Agent Davis concluded that someone had tipped off Defendant that he was the subject of an investigation by the FBI.  (Tr. 77-79).

On Monday, August 16, 2010, at approximately 8:00 a.m., Defendant telephoned Rene Ferachi, a detective with the Internal Affairs division of the CCPD.  (Tr. 6). Detective Ferachi was aware of the FBI investigation of Defendant.  (Tr. 7, 95-96). Detective Ferachi had neither requested nor expected Defendant's call.  (Tr. 6-7, 18). Defendant told Detective Ferachi that he wanted to meet with Internal Affairs in order to share some information about possible illegal drug activity.  (Tr. 7, 9).

At the time, the commander of Internal Affairs was Captain Olen Smith ("Captain Smith").  After learning of Defendant's call, Captain Smith called FBI Agent Davis and notified him about Defendant's request to come in and talk with Internal Affairs officers.  Agent Davis instructed Captain Smith to let Defendant come in and talk, but not to interrogate him.  (Tr. 104).  The FBI's plan was to come back later that day, interrogate Defendant, and confront him with the evidence that they had developed in order to strengthen their case against him.  (Tr. 108-09).

Around 9:00 a.m., Defendant arrived at the Internal Affairs office and met with Detective Ferachi, Captain Smith, and Lieutenant Craig Hammer in Detective Ferachi's office. (Tr. 8, 13-14, 19, 25-26, 31, 49-50).

At the meeting, the Internal Affairs officers gave no <u>Garrity</u> or <u>Miranda</u> warnings to Defendant. (Tr. 50). During the meeting, which lasted approximately two and half hours and was recorded, Defendant said that he had been providing security for "money transfers" or "money drops" with Rico, an individual whom he suspected may be a drug dealer. (Tr. 9, 19, 54-55). Defendant implied that he had been attempting to conduct his own investigation of Rico. (Tr. 56). Defendant also said that he was not sure if he had done anything illegal. (Tr. 9).

During Defendant's meeting with the Internal Affairs officers, there was no mention of the FBI investigation or employee discipline, employee termination or the status of Defendant's employment with the CCPD. (Tr. 23-24, 31, 147). At the conclusion of the meeting, Defendant expressed some concern about his personal safety as an officer. (Tr. 32, 128-29). In response, Captain Smith offered to allow Defendant to work the "watch office" when Defendant reported for duty that afternoon. (Tr. 32-33, 56-57, 129, 148). The watch office is located in the same building as Internal Affairs. (Tr. 57). Defendant accepted the assignment and left to go home and get dressed for

4

work.  (Tr. 129).  Defendant returned at 2:00 p.m. in his uniform (and  police-issued firearm), and began his 2:00 to 10:00 p.m. shift in the  watch office near the front entrance of police headquarters.  (Tr. 130).

After Defendant's meeting with Internal Affairs, Captain Smith called Agent Davis and told him that Defendant said that Officer Griffin introduced him to Rico several weeks ago and that Rico was interested in police protection for money transfers for a nightclub.   (Tr. 33-34).   Several hours later, Agent Davis asked Captain Smith if he would facilitate a meeting that evening between the FBI and Defendant at the CCPD headquarters so that the FBI could interrogate Defendant about the information the agents had gathered in their investigation.  (Tr. 34-35, 109).

Captain Smith arranged the meeting as requested and informed Defendant's supervisor and commanding officer, Captain Dean, of the meeting.   (Tr. 35). Agent Davis and another FBI agent arrived at the CCPD between 7:30 and 8:30 p.m. Captain Dean then contacted Defendant and told him to come upstairs to the law library because his services were needed.  (Tr. 35, 80, 131-32).  Defendant did not believe that he had the right to disobey his commanding officer's directive.  (Tr. 131-32).

On his way to the law library/conference room, Defendant encountered Captain Smith in the hallway.  Captain Smith told him to go into the room and tell the

5

FBI agents what he had told the Internal Affairs officers earlier in the day.  (Tr. 133).

Defendant entered the library with Captain Smith, who introduced him to FBI Agents

Davis and Van Epps.  (Tr. 80, 135).  Captain Smith then left the room and Defendant

was alone with the FBI agents.  The agents shut but did not lock the door to the room.

(Tr. 82).

As Agent Davis began explaining to Defendant that he was aware that Defendant

had some information that the FBI needed to know about, Defendant started telling the

agents a version of events consistent with his earlier statements to Internal Affairs.

Agent Davis had to interrupt Defendant to tell him that this was a criminal

investigation, that the agents had nothing to do with his administration, or hiring or

firing him, and that Defendant was free to leave.  The agents also gave Defendant the

option not to participate in the interview.  (Tr. 83).

Shortly after the interview started, Defendant began to change his story about

Rico.[1]  The agents then told Defendant they wanted to take his weapon for safety

reasons.  (Tr. 113).  The agents proceeded to take Defendant's service weapon, police

shirt, and bulletproof vest and removed them from the room.  Defendant was left

wearing his own T-shirt that was not part of his uniform.  (Tr.  114-115, 138-40).

_____

[1] I infer from this testimony that Defendant began to admit wrongdoing.

During the interview, the agents asked Defendant how he learned that he was under investigation. Defendant informed them that City of Atlanta Police Officer Erica Stanley had given him that information. (Tr. 87). The agents asked Defendant if he would cooperate with their investigation of the leak by making and recording phone calls with Erica Stanley. Defendant agreed to do so and signed a consent form indicating his agreement to record his conversations. On the form, he acknowledged that he had given his written permission voluntarily and without threats of any kind. (Tr. 88; Gov't Ex. 2).

During the interview with the FBI, Defendant admitted that he took a firearm from the driver of a vehicle that he had stopped for a traffic violation. He told the agents that the firearm was in a closet at his house. Defendant then agreed that the FBI agents could go to his house and search for the firearm and other evidence of criminal activity. (Tr. 89). Defendant signed a consent-to-search form on which he acknowledged that he had been advised of his right to refuse consent, that he gave permission voluntarily, and that he authorized the agents to take any items that they determined may be related to their investigation. (Tr. 89-90; Gov't Ex. 3).

7

The FBI's interview of Defendant lasted approximately four to five hours. (Tr. 85, 116). Defendant understood that he was the focus of a criminal investigation about five or ten minutes into the interview. (Tr. 137).

During the search at Defendant's residence, agents found and seized the firearm that Defendant admitted taking from a motorist during a traffic stop. (Tr. 91). After the search, the agents left Defendant alone at his house. (Tr. 154-55). Later that same day, August 17th, FBI agents filed a complaint against Defendant, and Defendant turned himself in to the FBI. (Tr. 93). Additional facts are discussed in context below.

## II.  DISCUSSION

A.    Application Of <u>Garrity v. New Jersey</u> To Defendant's Statements

Defendant argues that <u>Garrity v. New Jersey</u>, 385 U.S. 493 (1967), precludes the use of his statements at the trial of this case. In <u>Garrity</u>, the chief of police of a New Jersey borough, other police officers, and a court clerk were suspected of fixing traffic tickets. <u>Id.</u> at 494. The New Jersey Supreme Court ordered the state attorney general to conduct an investigation into the alleged misconduct and report his findings. A deputy attorney general questioned the suspects. A state statute required that they answer questions or lose their jobs and pensions. <u>Id.</u> at 497. Before conducting the interrogation, the deputy attorney general told each interviewee that his answers could

8

be used in state criminal proceedings and that if he refused to answer, he would be subject to removal from office. Id. at 494. The interviewees answered the questions posed to them. Later, local prosecutors brought criminal charges and introduced into evidence at trial the statements that the defendants had made to the deputy attorney general. After their convictions, the defendants appealed, claiming that the use of their compelled statements violated their constitutional rights. New Jersey courts rejected those claims. The United States Supreme Court reversed, holding that the admission of the compelled statements was unconstitutional. Id. at 500. The Court offered two explanations: (1) the statements were inadmissible under the Due Process Clause as coerced confessions, and (2) the state's threat to fire the police officers unless they gave statements was an unconstitutional condition. Id. at 497-500.

Here, unlike the situation in Garrity, there was no direct threat that Defendant would lose his job if he did not answer questions. However, under Eleventh Circuit precedent, a direct threat is not necessary to invoke the protection of Garrity. See United States v. Vangates, 287 F.3d 1315, 1321-22 (11th Cir. 2002). In the absence of a direct threat, the court must determine whether the officer's statements were compelled by examining his belief and the objective circumstances surrounding it. Id. In Vangates, the Eleventh Circuit stated:

> [F]or [the defendant's] statements to be protected under <u>Garrity</u>, the officer must have in fact believed [the] statements to be compelled on threat of loss of job and this belief must have been objectively reasonable. Put differently: First, the defendant must have subjectively believed that he was compelled to give a statement upon threat of loss of job. Second, this belief must have been *objectively reasonable* at the time the statement was made.

<u>Vangates</u>, 287 F.3d at 1322 (internal quotations and citations omitted).

Defendant's first set of statements, made to Internal Affairs officers, were made *at Defendant's request* after he learned that he was under investigation for criminal activity. There was absolutely no reason for Defendant to believe that his statements to Internal Affairs were compelled. In fact, Defendant initiated the contact with Internal Affairs in an attempt to head off any suspicion that he was knowingly involved in criminal activity with Rico. Defendant wanted to make it appear that he was asking for advice regarding Rico's suspicious activities in connection with money transfers for which he (Defendant) had innocently been providing security. (Tr. 55-56). Therefore, I conclude that Defendant did not subjectively believe that he had to give statements to Internal Affairs upon threat of loss of his job.

While Defendant's statements to the FBI present a closer issue, I conclude that those statements were also voluntarily made and should not be suppressed. Defendant emphasizes that his commanding officer instructed him to speak with the FBI agents,

10

and that he reasonably believed that he had no choice but to speak with them. However, the interview with the FBI was a logical follow-up to the conversation that Defendant had initiated earlier that day with Internal Affairs, as the FBI was the agency conducting the investigation about which Defendant wanted to volunteer information. Moreover, Captain Smith did not ask Defendant to do anything more than to repeat to the FBI what Defendant had voluntarily told Internal Affairs, and Defendant began his interview with the FBI by saying the same things he had said to Internal Affairs. Further, the FBI agents told Defendant that the agents had nothing to do with his administration, or hiring or firing him, and that Defendant was free to leave.  (Tr. 83).

In <u>Vangates</u>, the defendant, a corrections officer, testified in a civil trial in a § 1983 civil rights action in which she was accused of beating an arrestee.  <u>Vangates</u>, 287 F.3d at 1318.  Vangates was later indicted under 18 U.S.C. § 242 for the same conduct.  <u>Id.</u>  Vangates argued, *inter alia*, that the direction she received from the county to "cooperate" during the civil proceedings meant that she was compelled to forgo her Fifth Amendment protection.  The Eleventh Circuit disagreed, stating:

> Significantly, she was not told that she would be sanctioned if she failed to testify, and certainly she was not required to waive her Fifth Amendment rights. The general directive to cooperate was not sufficiently coercive to create an objectively reasonable belief that Vangates would be sanctioned if she invoked her Fifth Amendment rights.

11

Id. at 1324; see also United States v. Hill, 2010 WL 234798, at \*7 (N.D. Ga. Jan. 13, 2010)(rejecting a claim under Garrity by a police officer who subjectively believed that failure to follow police procedures requiring cooperation with external law enforcement agencies would lead to disciplinary action or dismissal). Like the cases cited above, the direction that Defendant received (to meet with the FBI and tell the FBI agents the same things that he had eagerly volunteered earlier in the day) does not lead to the conclusion that Defendant had an objectively reasonable belief that he would be fired if he invoked his Fifth Amendment rights.

Finally, in determining whether Defendant's statements were "coerced" within the meaning of Garrity, the court must consider "whether the totality of the circumstances supports a conclusion of involuntariness." See Vangates, 287 F.3d at 1320 (citation and internal quote marks omitted). Here, Defendant was a trained police officer who knew that he had the constitutional right to remain silent if his answers to questions might incriminate him. He also knew, from a leak of confidential information, that he was potentially in serious trouble as a result of his dealings with Rico. Defendant made a strategic choice to give a version of events to his employer, and later to the FBI, that he believed would cast his conduct in a favorable light. Thus, Defendant's statements were motivated, not by coercion from his employer, but rather

AO 72A
(Rev.8/8
2)

by his strategic decision that making the statements that he did would be in his own self interest.  He cannot credibly claim that his statements were made out of fear that he would be fired if he did not speak.  For these reasons, Defendant is not entitled to protection under <u>Garrity v. New Jersey</u>, 385 U.S. 493 (1967), and its progeny.

**B.      Defendant Was Not In Custody At The Time Of His Statements**

Defendant was not given <u>Miranda</u> warnings.  He argues that he was in custody during the FBI interview and was therefore entitled to <u>Miranda</u> warnings before he made any statements or answered any questions.  The well-known general rule is that a person who is arrested and detained must be given full <u>Miranda</u> warnings in order for his statements made in response to interrogation by a law enforcement officer to be used against him in court.  <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

<u>Miranda</u> warnings are required only when a defendant is interrogated while in custody.  <u>See</u> <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994).  To determine whether a suspect is in custody, the court must examine the objective circumstances from the perspective of a reasonable person in the defendant's position.  <u>Berkemer v. McCarty</u>, 468 U.S. 420, 442 (1984).  While courts consider the totality of the circumstances, "the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  <u>Stansbury</u>, 511 U.S. at 322

13

(internal quote marks and citation omitted); <u>United States v. Acosta</u>, 363 F.3d 1141, 1149 (11th Cir. 2004).

In this case, the FBI agents interrupted Defendant early in the interview to tell him that he was free to leave and to make sure that he knew that the interview was not mandatory.  (Tr. 83).  Defendant was never placed in handcuffs and the agents never brandished any weapons.  There was no restraint on Defendant's freedom of movement of the degree associated with a formal arrest.

The facts in <u>United States v. Phillips</u>, 812 F.2d 1355 (11th Cir. 1987), are instructive.  In <u>Phillips</u>, a police officer asked Luke Finkelstein, a firearms dealer, to come to the police station and give a statement regarding the sale of a gun that was later used in an armed robbery and murder in North Carolina.  <u>Id.</u> at 1356-57.  Finkelstein agreed and was driven by the officer to the police station, where he gave a statement.  During the interview, as with the instant case, Finkelstein was not arrested, handcuffed, or locked in a room.  Unlike the present case, he was not told he was free to leave, but the officers did nothing to prevent him from leaving the police station.  <u>Id.</u>  The Eleventh Circuit found that Finkelstein, who was later charged with the illegal sale of firearms, was not in custody when he was interrogated and gave his statement.  <u>Id.</u> at 1362.

14

Defendant argues that he felt compelled by his supervisors to submit to the FBI's interview. However, a simple instruction from a supervisor to attend an interview does not render that interview custodial. See United States v. Muegge, 225 F.3d 1267, 1271 (11th Cir. 2000)(concluding that even though defendant's supervisor instructed him to report for questioning at the Air Force base's office of special investigations, such an order did not constitute the type of restraint on the defendant's freedom associated with a formal arrest). And, as discussed in detail above, Defendant initiated the first interview with Internal Affairs that logically led to the FBI interview about the subjects on which Defendant wished to speak.

Defendant further argues that the custodial nature of the interview was demonstrated by the FBI agents' taking of his police-issued gun, bulletproof vest and uniform at the request of the CCPD. However, as Defendant points out, the CCPD likely wanted the FBI to retrieve Defendant's police weapon and uniform because the CCPD intended, even before the interview, to fire Defendant once he was confronted with the evidence that the FBI had developed prior to August 16th. (Doc. 30, Def.'s Br. at 19). Therefore, Defendant's own argument shows that the FBI's taking of Defendant's police-issued property was not motivated by an intent to place Defendant in custody. Similarly, a reasonable person in Defendant's position would have logically

15

concluded that once he admitted to the FBI that he had committed crimes and was confronted with the evidence against him, he would not have been allowed to keep his weapon and police uniform.  Thus, the FBI's taking of Defendant's gun and police clothing, under the circumstances presented here, at most only minimally supports the argument that Defendant was placed in custody or believed that he was in custody.

Defendant cites United States v. Panak, 552 F.3d 462 (6th Cir. 2009), for the propositions that (1) a citizen may be considered in custody for purposes of Miranda even though there is not a formal arrest at the time of the interview; and (2) an investigator's presentation of incriminating evidence against a suspect can create a hostile, coercive atmosphere that amounts to custody.  Id. at 470.

It is true that the FBI presented Defendant with evidence of his crimes, a factor that may, under some circumstances, support a conclusion that a suspect was placed in custody.  However, here, that factor is not sufficient to indicate custody, particularly in light of the fact that the FBI agents told Defendant near the beginning of the interview that he was free to leave.

The totality of the circumstances, including the facts that the agents advised Defendant that he was free to leave, that Defendant initiated the interview with the CCPD for strategic reasons, and that Defendant was never handcuffed or formally

16

AO 72A
(Rev.8/8
2)

arrested demonstrate that Defendant was not in custody at the time of his statements to the FBI.  A reasonable person would not have felt a restraint on his freedom of the degree associated with a formal arrest.  Accordingly, <u>Miranda</u> warnings were not required.

**C.  Defendant Voluntarily Consented To Make A Monitored Telephone Call And To Allow A Search Of His Residence**

Defendant also argues that he was unlawfully induced to make a monitored phone call and to allow a search of his residence.  Specifically, Defendant contends that his movement was controlled and that FBI agents told him that he needed to sign the two consent forms if he wanted to help himself, and therefore his consent was invalid. (Doc. 30 at 25-26; Tr. 142-44).

Agent Smith did tell Defendant that his cooperation would help him out. However, I credit Agent Smith's testimony that he also would have told Defendant that he (Agent Smith) had no authority, but that he would bring Defendant's cooperation to the attention of the U.S. Attorney.  (Tr. 116).  A statement made by a law enforcement officer to an accused that the accused's cooperation would probably be helpful to him is not a sufficient inducement so as to render a subsequent incriminating statement involuntary.  <u>See</u> <u>United States v. Davidson</u>, 768 F.2d 1266, 1271 (11th Cir. 1985).

17

Where the validity of a search rests on consent, the government has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given. Florida v. Royer, 460 U.S. 491, 497 (1983). The government also bears the burden of proving that the consent was not a mere submission to a claim of lawful authority. Id. The government sustains its burden by proving voluntariness by a preponderance of the evidence. United States v. Matlock, 415 U.S. 164, 178 n.14 (1974). In deciding whether the government has met its burden, this court must consider the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989).

In analyzing the totality of circumstances, a number of factors are relevant. These generally include such considerations as age, education, background, and physical and mental condition of the consentor, as well as the setting in which the consent was allegedly obtained. Bustamonte, 412 U.S. at 226. The Eleventh Circuit has listed the following as relevant factors in determining voluntariness, none of which is dispositive: (1) the defendant's custodial status; (2) the presence of coercive police procedure; (3) the extent and level of the defendant's cooperation with police; (4) the

18

defendant's awareness of his right to refuse to consent to the search; (5) the defendant's education and intelligence; and (6) "significantly, the defendant's belief that no incriminating evidence will be found." United States v. Blake, 888 F.2d 795, 798-99 (11th Cir. 1989)(citations omitted).

Here, the relevant factors weigh heavily in favor of a finding of voluntary consent. Defendant was a trained police officer with a college degree. He was not in custody, and he acknowledged in writing that he had been advised of his right to refuse consent. (Gov't Ex. 3). He was exhibiting a desire to cooperate with the criminal investigation. Considering the totality of circumstances, I find that Defendant voluntarily consented to make a monitored telephone call and to allow a search of his residence.

## III.  CONCLUSION

For the reasons discussed above, I **RECOMMEND** that Defendant's Motion to Suppress Evidence and Statements [Doc. 19] be **DENIED**.

There are no pending matters before me, and I am aware of no problems relating to the scheduling of this case for trial. It is therefore **ORDERED AND ADJUDGED** that this action be declared **READY FOR TRIAL**.

19

AO 72A
(Rev.8/8
2)

It is so **ORDERED** and **RECOMMENDED**, this 25th day of July, 2011.

_Gerrilyn G. Brill_
GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)