## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**UNITED STATES OF AMERICA,**

**v.**                                                            **1:10-cr-353-WSD**

**JONATHAN S. CALLAHAN,**

                                    **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Jonathan S. Callahan's ("Defendant")

Objections [40] to Magistrate Judge Gerrilyn G. Brill's Report and

Recommendation ("R&R") [39] recommending that Defendant's Motion to

Suppress Evidence and Statements [19] be denied.

## I.      BACKGROUND

Defendant is charged with two counts of deprivation of rights under color of

law, three counts of aiding and abetting possession of cocaine with intent to

distribute, three counts of extortion under color of law, and one count of possession

of a stolen firearm, in violation of 18 U.S.C. §§ 242, 1951(a), 922(j) and 924(a),

and 21 U.S.C. §§ 841(a) and (b), and 846  [1].

Defendant is a police officer in the Clayton County Police Department ("CCPD").[1]  CCPD Officer Tony Griffin reported to CCPD's Internal Affairs division ("IA") that Defendant had stolen money and firearms from motorists that he stopped for traffic violations.  IA reported this information to the FBI, which initiated an undercover investigation of Defendant.

The investigation, conducted by Special Agent Brian Davis, consisted of a sting operation in which Officer Griffin cooperated with the FBI and recorded his conversations with Defendant.

Officer Griffin introduced Defendant to a person cooperating in the investigation posing as a drug dealer named Rico.  Defendant was to provide protection for drug deals engaged in by Rico.  After Defendant had provided protection for several of Rico's undercover drug deals, he became nervous and told Officer Griffin he intended to report his dealings with Rico to the CCPD IA.

On the morning of August 16, 2010, IA Detective Rene Ferachi received a call from Defendant.  Defendant stated he wanted to share with IA information about illegal drug activity.  Detective Ferachi told the IA commander, then-Captain

---

[1] The facts are set out more fully in the R&R.  Defendant has not objected to the facts reported in the R&R and, finding no plain error in them, the Court adopts the facts as the Court's findings of fact.  These facts are summarized in this Order.

Olen Smith, about the call.  Captain Smith reported the call to Special Agent Davis.

Special Agent Davis suspected that someone had informed Defendant he was under investigation by the FBI.  Special Agent Davis told Captain Smith to allow Defendant to meet with IA to make his report and that representatives of the FBI would meet with Defendant later that day to confront him with the evidence they had developed regarding his illegal activities.

About an hour after Detective Ferachi received Defendant's request to meet, Detective Ferachi, Captain Smith, and IA Lieutenant Hammer met with Defendant to receive his report about illegal drug activity.  A Miranda warning was not given to Defendant.  Defendant was not told that his employment or his employment status depended on his willingness to make the report he requested to make to IA.

Defendant told the IA representatives he had provided "security" to Rico for "money drops" or "transfers" and that he suspected Rico was a drug dealer. Defendant implied he was providing this security to Rico as part of his own investigation into Rico's criminal activity.

Defendant said he was not sure if he had done anything illegal in engaging in the activities he described.  The IA representatives did not tell him about the FBI investigation.

As the meeting concluded, Defendant expressed some concern about his safety as a result of his activities with Rico.  Captain Smith offered to allow Defendant to work in the watch office rather than on patrol.  Defendant agreed to the assignment and returned later that day in uniform with his firearm to work in the watch office.[2]

Captain Smith reported to Special Agent Davis the results of his meeting with Defendant, including that Defendant had told IA he had been introduced to Rico by Officer Griffin and that Rico asked Defendant to provide protection for money transfers at a nightclub.  Captain Smith, at Special Agent Davis's request, set up a meeting between Special Agent Davis and Defendant that evening.

Sometime between 7:30 p.m. and 8:30 p.m., Defendant was told by his commander, Captain Dean, to go to the law library conference room because he was needed there.  En route to the library, Defendant encountered Captain Smith, who told him to go into the library and tell the FBI what Defendant had reported to IA earlier in the day.

Defendant met with FBI Special Agent Davis and Special Agent Van Epps in the library.  Defendant began to tell the agents what he had told IA earlier.  In the early stages of his report, Special Agent Davis interrupted Defendant to tell

---

[2] The watch office is apparently a job performed within the CCPD offices.

him they were conducting a criminal investigation, that they did not have any

authority over the CCPD, did not have authority to hire or fire him, and that

Defendant did not have to participate in the interview and could leave the room if

he wished.[3]

As the interview continued, Defendant altered his account of his relationship

with Rico from what he had told IA earlier in the day.  When this occurred, the

agents, including for safety reasons, asked Defendant to give them his weapon, his

protective vest, and his uniform shirt.

At some point in the interview, Defendant was asked how he had learned he

was under investigation.  After being asked to cooperate by the agents, Defendant

admitted that City of Atlanta Police Officer Erica Stanley had provided that

information to him.  In response to the agents request for Defendant's cooperation,

Defendant agreed to record his conversations with Officer Stanley as part of an

FBI leak investigation.  Defendant signed a form consenting to cooperate by

recording his conversations with Stanley.

Later in the interview, Defendant admitted to the agents that he had taken a

firearm from the driver of a vehicle he had stopped and admitted that the firearm

was at his home in a closet.  Defendant consented to a search of his home for the

---

[3] During the interview in the library, the door was closed but unlocked.

weapon and other evidence of criminal activity.  Defendant signed a consent to

search form, which acknowledged he was not required to consent and that he

voluntarily was consenting to a search of his home.

The duration of the interview with Defendant was four or five hours and

Defendant knew shortly after it started that the investigation was focused on his

conduct.

Upon searching Defendant's home early on August 17, 2010, agents seized

the firearm Defendant admitted he had taken during the traffic stop.  Later that

same day, the FBI filed a complaint against Defendant and he turned himself in.

## II.    DISCUSSION

### A.    Legal Standard

After conducting a careful and complete review of the findings and

recommendations, a district judge may accept, reject, or modify a magistrate

judge's report and recommendation.  28 U.S.C. § 636(b)(1); Williams v.

Wainwright, 681 F.2d 732 (11th Cir. 1982), cert. denied, 459 U.S. 1112 (1983).  A

district judge "shall make a de novo determination of those portions of the report

or specified proposed findings or recommendations to which objection is made."

28 U.S.C. § 636(b)(1).  This requires that the district judge "'give fresh

consideration to those issues to which specific objection has been made by a

party.'"  Jeffrey S. by Ernest S. v. State Board of Educ. of Ga., 896 F.2d 507, 512

(11th Cir. 1990) (quoting H.R. Rep. No. 94-1609, 94th Cong., 2d Sess. (1976)).

With respect to those findings and recommendations to which a party has not

asserted objections, the Court must conduct a plain error review of the record.

United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983), cert. denied, 464 U.S.

1050 (1984).

    B.    Analysis

    Defendant objects to the legal conclusions in the R&R.  Defendant states

that the Magistrate Judge erred in concluding that: (i) Defendant's statements to

the FBI were not protected under Garrity v. New Jersey, 385 U.S. 493 (1967); (ii)

Defendant was not entitled to warnings pursuant to Miranda v. Arizona, 384 U.S.

436 (1966), because the interview was non-custodial; (iii) Defendant's consent to

the search of his home and the recording of his phone call with Erica Stanley was

voluntary; and (iv) Defendant's consent to the search of his home and the

recording of his phone call with Erica Stanley were not fruits of an illegal

interrogation.[4]

---

[4] These last two objections are brief and conclusory, and it is not clear to the Court
that Defendant intended them as separate objections.  The Court finds them
sufficiently specific to be considered by the Court.  See Marsden v. Moore, 847
F.2d 1536, 1548 (11th Cir. 1988) ("Parties filing objections to a magistrate's report
and recommendation must specifically identify those findings objected to.

1.     Defendant's statements are not protected under <u>Garrity</u>

Defendant first objects to the Magistrate Judge's conclusion that his statements to the FBI agents during the meeting on August 16, 2010, were not protected under <u>Garrity</u>.  Defendant argues that he subjectively believed he was compelled by the potential loss of his job to submit to the FBI interview and that his belief that he would lose his job if he did not submit to the interview was objectively reasonable.  <u>See</u> <u>United States v. Vangates</u>, 287 F.3d 1315, 1322 (11th Cir. 2002).  The Court disagrees.

"<u>Garrity</u> protects police officers from having to choose between cooperating with an internal investigation and making potentially incriminating statements. Immunity under <u>Garrity</u> prevents any statements made in the course of the internal investigation from being used against the officers in subsequent criminal proceedings."  <u>Vangates</u>, 287 F.3d, at 1320 (quoting <u>In re Federal Grand Jury Proceedings</u>, 975 F.2d 1488, 1490 (11th Cir. 1992)).  To establish that his statements were protected under <u>Garrity</u>, Defendant must prove: (1) that he "subjectively believed that he was compelled to give a statement upon threat of loss of job"; and (2) that this belief was "*objectively reasonable* at the time the statement was made."  <u>Id.</u> at 1322.

Frivolous, conclusive, or general objections need not be considered by the district court.").

Defendant argues that he subjectively and reasonably believed he would lose his job if he did not give a statement because he was instructed by a superior officer to tell the FBI agents what he had told IA earlier in the day; and, because the FBI agents requested that he relinquish his firearm, protective vest, and uniform shirt, including for safety purposes during the interview.  The Court concludes the facts here do not support that Defendant held either a subjective or objectively reasonable belief that he was compelled to speak to the FBI agents or that his failure to do so would result in the loss of his job.

The meetings with IA, and later with the FBI, were initiated by Defendant after being tipped off that he was under investigation and motivated by a self-serving strategy to justify the activities he engaged in with Rico.  This strategy was initiated when he asked to meet with IA on August 16, 2010, to explain why he had worked with Rico and provided security for him.  The purpose of this meeting was to portray his conduct in a favorable light and to minimize any adverse consequences.  During the meeting, which IA officials neither requested, nor required Defendant to attend, IA officials did not require Defendant to report any misconduct or explicitly or impliedly suggest that his statements would affect his employment with the CCPD in any way.

That evening, Defendant was simply instructed by his commander to repeat to the FBI what he had voluntarily said to IA earlier in the day.  Under these circumstances, he could not subjectively or reasonably believe this request compelled him to speak with the agents.

The Court notes further that the agents made it clear to Defendant that he was not required to participate in the meeting and could leave it at any time of his choosing.  The agents reminded him they did not have any authority over his employment.  The law is well-settled that a "general directive to cooperate" is not, in and of itself,  "sufficiently coercive to create an objectively reasonable belief that [Defendant] would be sanctioned if [he] invoked [his] Fifth Amendment rights."  Id. at 1324; see also United States v. Hill, 2010 WL 234798, at *7 (N.D. Ga. Jan. 13, 2010).

Defendant also argues that being informed of a criminal investigation of him and having to surrender his firearm, protective vest, and uniform shirt, for safety purposes led Defendant to believe his failure to comply in the interview would result in his termination.  Thus, Defendant argues, the statements he made were compelled and are required to be suppressed under Garrity.

The record discredits that Defendant was compelled—if he was in fact compelled—to do anything other than to repeat to the interviewing FBI agents the

same information that the Defendant had voluntary offered to IA that morning. The FBI independently was investigating Defendant.  While that investigation began as a result of information reported to the FBI from the CCPD and its IA division, neither the FBI agents who conducted the interview, nor the IA agents who directed Defendant to meet with the federal agents, ever threatened Defendant with loss of his employment or any other employment consequence if he repeated to the agents what he previously said to IA.

That Defendant initiated the IA report—even if for self-serving, prophylactic purposes—discredits any belief by Defendant at the IA interview or the later FBI interview that he was compelled to make the statements he made.  That Defendant, at the FBI interview, chose not to terminate the interview when asked how he learned he was under investigation suggests that Defendant was not compelled, but rather chose, to admit he had engaged in wrongful conduct and had wrongfully been advised by Officer Stanley of the FBI investigation of him.

Ultimately, the Court must determine under Garrity whether the totality of the circumstances supports a conclusion that Defendant's statements were involuntary.  See Vangates, 287 F.3d at 1320.  On the facts here, the Court necessarily concludes that: (i) Defendant did not subjectively, nor could he reasonably, believe he was compelled to attend the IA or FBI meetings or was

compelled to make statements at either of those interviews; and, (ii) that the statements made by Defendant were completely voluntary.  The Defendant's interview strategy was based on his voluntary decision to try and prevent law enforcement from discovering his illegal conduct with Rico and during traffic stops.  That is what compelled him to talk to IA and the FBI, not a concocted fear he could lose his position.

Garrity does not preclude the use of statements Defendant made on August 16, 2010.  Defendant was a seasoned law enforcement officer, fully aware of his constitutional rights, and specifically told by the FBI agents that he was free to leave whenever he wanted.  He chose to stay and he chose to speak because he concluded it was in his interest to do so.  Defendant's objection based on Garrity is overruled.

> 2.      Defendant was not entitled to Miranda warnings because he
>         was not in custody

Defendant next objects to the Magistrate Judge's findings that Defendant was not in custody at the time of the interrogation and that the FBI agents were not required to advise Defendant of his rights pursuant to Miranda.  See Miranda, 384 U.S., at 436.  "A person taken into custody must be advised of his right to remain silent and his right to counsel prior to any interrogation."  United States v. Muegge, 225 F.3d 1267, 1269-70 (11th Cir. 2000).  "Even if a person has not been arrested,

advice of <u>Miranda</u> rights is required if there is a restraint on freedom of movement of the degree associated with a formal arrest." <u>Id.</u> at 1270 (internal quotation marks omitted). "The key inquiry in determining if interrogation was custodial is whether an innocent individual in that situation would feel free to leave." <u>Id.</u> at 1271.

The FBI agents told Defendant directly, at the outset of the interview, that he was free to leave. Ordinarily, this alone would make an interrogation non-custodial as a matter of law. <u>Id.</u> Defendant argues, however, that there were additional restraints imposed when his firearm, protective vest, and uniform shirt were requested to be relinquished to the FBI agents. The Court thus considers whether "the restraints placed on [Defendant's] freedom [were] so extensive that telling [him] he was free to leave could not cure the custodial aspect of the interview." <u>Id.</u>[5]

Defendant contends that by taking away his firearm, protective vest, and uniform shirt, the agents left him "literally stripped down to his t-shirt and stripped of any dignity befitting a non-coercive, non-custodial 'interview.'" (Def.'s Objections at 10). This occurred, according to Defendant's account, within the

---

[5] Defendant attempts to distinguish <u>Muegge</u> because in that case, the defendant had signed a form after the interview reciting his <u>Miranda</u> rights and stating that the interview had been non-custodial. The <u>Muegge</u> opinion noted that this detail was not relevant to the court's decision in the case. <u>Id.</u> at 1270 n.1.

first five minutes of the interview, shortly after Defendant was told he was free to leave at any time.  (Id. at 5.)

The Court concludes that taking custody of these items did not create a custodial environment or contradict the agents' statement that Defendant was free to leave because a reasonable person in these circumstances would not expect to be allowed to keep his firearm, protective vest, or uniform shirt.  The request for these items occurred at a time when Defendant was in the process of changing his account of his relationship and conduct with Rico, acknowledging he was aware he was under investigation because that information had been leaked to him by an Atlanta Police Department officer, and receiving confirmation from the agents that he was under investigation.  Safety required the relinquishing of the items requested.

The agents also told Defendant he was not in custody and was free to leave when he wanted.  There were no indicia that Defendant was restrained in any way, much less anything to indicate a formal arrest.  Defendant was questioned in a familiar setting in his own workplace.  Defendant's decision to stay in the room with the agents was not a result of any coercion by the agents, but because he was motivated by his self-interest to put his conduct in the best light possible, first to mislead the investigating agents, and later to mitigate his criminal exposure.  The

Magistrate Judge correctly concluded that <u>Miranda</u> warnings were not required to be given, and Defendant's objection based on <u>Miranda</u> is overruled.

> 3.      Defendant's consent to the search and the monitored phone call was not involuntary

Defendant claims, without argument or supporting facts, that Defendant's consent to the search and the monitoring of his phone call with Officer Stanley were involuntary. "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." <u>United States v. Garcia</u>, 890 F.2d 355, 360 (11th Cir. 1989). Relevant factors include (1) the defendant's custodial status; (2) the presence of coercive police procedure; (3) the extent and level of the defendant's cooperation with police; (4) the defendant's awareness of his right to refuse to consent to the search; (5) the defendant's education and intelligence; and (6) the defendant's belief about whether incriminating evidence will be found.

The Magistrate Judge concluded, correctly, that the evidence heavily supports the finding that Defendant gave his consent voluntarily. Defendant was not in custody, coercive police procedure was not present, and the right not to consent was recited on the form Defendant signed. The Court notes that Defendant was well-educated and was a trained law enforcement officer. The Court finds that

Defendant's consent was voluntary and his objection based on the absence of voluntariness is overruled.

> 4.    The monitored phone call and search of Defendant's home were not products of an unconstitutional interrogation

Defendant finally argues that, because his interrogation violated his rights under Garrity and Miranda, the evidence from monitoring his phone call to Officer Stanley and the search of Defendant's home should be suppressed as direct products of an unconstitutional interrogation.  The Court has determined that the interviews of the Defendant did not violate Defendant's constitutional rights, and thus, the monitored phone call and home search did not derive from an unconstitutional interrogation.  Defendant's objection is overruled.

## III.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant's Objections to the Magistrate Judge's Report and Recommendation [40] are **OVERRULED** and the Report and Recommendation [39] is **ADOPTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress [19] is **DENIED**.

16

**SO ORDERED** this 26th day of September, 2011.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE